| | | |
|---|---|---|
| MIRANDA J. ROLFF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:13 CV 109 DDN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Miranda J. Rolff for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and for supplemental security income under Title XVI of that Act, 42 U.S.C. §§ 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 10.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff Miranda J. Rolff, born April 7, 1986, filed applications for Title II and XVI benefits on December 31, 2008. (Tr. 95-102.) She alleged an onset date of disability of February 1, 2004, later amended to August 1, 2008, due to depression, anxiety, bipolar disorder, panic attacks, mood swings, fatigue, and seizure-like episodes. (Tr. 27, 150.) Plaintiff's applications were denied initially on March 13, 2009, and she requested a hearing before an ALJ. (Tr. 54-57.)

On November 4, 2009, following a hearing, the ALJ found plaintiff not disabled. (Tr. 10-20.) On April 12, 2011, the district court remanded the case to the ALJ at the request of the Commissioner. (Tr. 351.) On September 25, 2013, following another hearing, the ALJ found plaintiff not disabled. (Tr. 290-303.) Thus, the second decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On May 16, 2005, Michael Gadsen, M.D., performed a psychiatric evaluation on plaintiff. She complained of lack of Medicaid coverage and medication and a history of seizures and bipolar disorder. At the time of the evaluation, plaintiff, age nineteen, had a one-year old child. She reported extreme episodes of hyperactivity followed by episodes of depression and suicidal ideation. She began receiving psychiatric treatment due to depression at age sixteen. Her medications included Lexapro, Klonopin, and Seroquel.[1] She also complained of anxiety and panic attacks that led to non-epileptic seizures and that she suffers two to three panic attacks and seizures per day. She reported excessive worrying and described herself as a perfectionist. She reported that she graduated from high school and had a fourteen-year old stepbrother. She had worked for Ponderosa, Prairie Machine, and Subway, and recently took medical leave of absence from Wal-Mart due to seizures. She enjoyed reading and writing poetry. She lived in a trailer with her son and her significant other. (Tr. 226-28.)

Dr. Gadsen described her affect as slightly anxious and guarded and her judgment and insight as good. He also described her as of above average intelligence with good verbal skills. His impression was moderate, recurrent major depression, dysthymic disorder, panic disorder with agoraphobia and generalized anxiety disorder, and he considered obsessive-compulsive disorder. He further assessed a GAF score of 57.[2] He increased her Lexapro dosage and prescribed lorazepam.[3] (Id.)

---

[1] Lexapro is used to treat depression and other mental/mood disorders. WebMD, http://www.webmd.com/drugs. Klonopin is used to prevent and control seizures. Id. Seroquel is used to treat certain mental/mood conditions. Id.

[2] GAF score helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.

On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32–34 (4th ed. 2000) ("DSM").

[3] Lorazepam is used to treat anxiety. WebMD, http://www.webmd.com/drugs.

On August 22, 2005, plaintiff complained of cough and congestion that began three days earlier. Melissa F. Rendlen, D.O., assessed bronchitis and prescribed Levaquin.[4] (Tr. 266.)

On February 27, 2008, plaintiff complained of sinus problems, sore throat, coughing, and fever. John P. Groving, D.O., assessed sinusitis and prescribed Augmentin.[5] (Tr. 232-33.)

On May 14, 2008, Sean Meyer, QMHP, performed a psychosocial clinical assessment on plaintiff. At the time of the assessment, plaintiff, age twenty-two, measured five feet, four inches, and 142 pounds. He described her affect as moderately flat and noted poor insight and limited judgment. He further noted that she had difficulty recalling dates and time lines. She lived with her mother in a mobile home, her half-brother, and her two sons, ages four and two. A physician managed her psychiatric medication. She had a job and had enrolled her four-year old son in tee ball. (Tr. 206-13.)

She complained of depression, bipolar disorder, anxiety, and seizure-like symptoms. She also required dental care. She had not sought medical care due to lack of funds and insurance coverage. She took less than the prescribed dosage on her psychiatric medication due to the need for remain alert for childcare and work. She also felt concerned about the effect of her seizure-like episodes on her ability to drive. Her medications included Trileptal, Klonopin, Lexapro, Cogentin, and Abilify.[6] Meyer noted that her medical records indicated missed psychiatric appointments, failures to follow up on referrals, and limited medication compliance. Her medical history also included complaints of migraines. (Id.)

She reported persistent anxiety and racing thoughts. Her ex-boyfriend and living arrangements cause her stress. She underwent psychiatric hospitalization the previous year after a breakdown caused by her ex-boyfriend's harassment. She works nights at a residential care facility and cares for her children during the day. She copes with stress by watching television, caring for her children, writing, isolation, deep breaths, cleaning, and crying. She expressed the desire to continue meeting regularly with a clinical social worker for support and assistance with

_____

[4] Levaquin is an antibiotic. WebMD, http://www.webmd.com/drugs.

[5] Augmentin is an antibiotic. WebMD, http://www.webmd.com/drugs.

[6] Trileptal is used to treat seizure disorders. WebMD, http://www.webmd.com/drugs. Cogentin is used to treat involuntary movements. Id. Abilify is used to treat certain mental/mood disorders. Id.

finding alternative living arrangements.  Her social worker indicated that she often wants him to make her decisions.  (Id.)

In 2007, the death of her father overwhelmed her.  Further, she received guardianship over her half-brother, but her mother did not give her his social security funds.  Additionally, her brother got in trouble at school, and she lost her job at Wal-Mart.  In April 2007, she underwent hospitalization for two days.  The hospitalization records indicated yelling, throwing and breaking figurines, and suicidal thoughts.  Her medical records also revealed reports that she heard voices.  Her symptoms included irritability, anxiety, panic attacks, withdrawal, and isolation.  She reported worrying about finances, occasional depression, and crying.  She had lost interest in several activities, including shopping, conversing, and housework.  She further reported that she felt uncomfortable working with the public and suffered from anxiety at work.  Additionally, she reported that she smoked cigarettes and drank caffeinated beverages but no alcohol.  (Id.)

She received health benefits from the state for herself and her children in addition to child support and food stamps.  Her application for disability income was denied.  Her stress-induced seizures cause her to avoid certain activities when stressed, such as cooking and driving.  Her social worker accompanies her to psychiatric appointments, grocery shopping, and for other treatment-related needs.  She can perform housework.  She reported a weak social life due to childcare and work duties.  Meyer assessed severe, mixed bipolar I disorder with psychotic features, panic disorder with agoraphobia, and conversion disorder.  He further assessed a GAF score of 64 and suggested that she suffered posttraumatic stress disorder.[7]  Meyer recommended that plaintiff continue in Community Psychiatric Rehabilitation to ensure medical compliance, increase social support, build coping skills, and improve her living conditions and for financial assistance.  (Id.)

On June 12, 2008, plaintiff reported that she had been hearing fewer voices and slept about four hours per night.  She complained of racing thoughts, anxiety, irritability, crying, and

---

[7] A GAF score from 61–70 represents some mild symptoms (such as depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (such as occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  DSM–IV–TR at 32–34.

depression. She also complained of daytime sedation due to her Seroquel prescription. Carolyn L. Seifert prescribed Risperdal.[8] (Tr. 225.)

On July 23, 2008, plaintiff reported suffering fewer racing thoughts and hearing fewer voices. She further reported improved focus and anxiety regarding her son's visit with his father. Additionally, she reported that her schedule allows her only four hours of sleep per day. Dr. Seifert assessed improved bipolar I disorder with psychotic features. She discontinued Abilify and increased her dosage of Risperdal. (Tr. 221-22.)

On October 28, 2008, plaintiff complained that her medications caused her to feel overwhelmed. Mark A. Tucker, D.O., assessed bipolar I disorder, panic disorder, conversion disorder, and psychogenic pseudo-seizures. (Tr. 231.)

On December 29, 2008, plaintiff complained of a sore throat and fever. Leslie A. McCoy, D.O., assessed tonsillitis and prescribed Omnicef.[9] (Tr. 267.)

On January 15, 2009, plaintiff complained of increased seizures and migraine headaches. She further reported that Risperdal caused her to feel ill and prevented her from eating. Additionally, she reported difficulty sleeping and that she exhausted her supply of Klonopin. Dr. Tucker assessed chronic seizure disorder, anxiety neurosis, bipolar disorder, spinal somatic dysfunction, and migraine cephalgia. He applied osteopathic manipulation to her spine and replaced Risperdal with citalopram.[10] (Tr. 263.)

On January 22, 2009, plaintiff complained of seizures that occurred up to three times per day and dizziness. She reported that the seizures caused loss of bowel control. She further reported that her back pain had returned and requested further osteopathic manipulation. Additionally, she requested contraception. Dr. Tucker increased her Seroquel dosage and issued referrals for seizure treatment and her contraception request. He further applied osteopathic manipulation to her spine and recommended that she stop smoking. (Tr. 259-61.)

---

[8] Risperdal is used to treat certain mental/mood disorders. WebMD, http://www.webmd.com/drugs.

[9] Omnicef is an antibiotic. WebMD, http://www.webmd.com/drugs.

[10] Citalopram is used to treat depression and other mental/mood disorders. WebMD, http://www.webmd.com/drugs.

On March 3, 2009, Frank Froman, Ed. D., performed a psychological report on plaintiff. Plaintiff reported the following. She continues to live with her mother and two children. She experienced two pseudo-seizures, and her last seizure occurred over a year ago. She last worked for Wal-Mart but had worked several jobs for short periods. She rarely socializes and smokes less than one pack of cigarettes per day. She has a driver's license and vehicle and drove herself to the evaluation that day. She sleeps only three hours per night. She can perform childcare, housework, and personal hygiene tasks. Dr. Forman found her IQ to be in the low average range. Plaintiff received a diagnosis of bipolar disorder at age sixteen and suffers periods of extremely rapid mood cycling. Panic attacks occur about once every other day, and she hears voices. (Tr. 236-39.)

Dr. Froman diagnosed rapid-cycling bipolar disorder and panic disorder with agoraphobia and assessed a GAF score of 48. He found that she could sometimes perform one- or two-step tasks at a competitive rate but could not do so during her down times. He further found her able to relate adequately but minimally to coworkers and supervisors but unable to operate in a heavily populated environment. Additionally, he found that she could understand simple instructions and manage cash benefits. He opined that she could not withstand the stress caused by standard employment. (Id.)

On March 8, 2009, plaintiff complained of headaches, fever, and malaise. She rated her headache pain as eight of ten. Diane Nutter, NP, noted plaintiff as eight months into her pregnancy and recommended that plaintiff avoid taking ibuprofen. She assessed cephalgia and prescribed Vicodin. (Tr. 268.)

On March 9, 2009, plaintiff arrived at the emergency room, complaining of severe headaches that began five days earlier. She rated the pain at ten of ten. Karl D. Harmston, D.O., noted that she suffered a seizure in the waiting room. A CT scan of the head revealed chronic left maxillary sinusitis but no other abnormalities. Dr. Harmston diagnosed a migraine headache. (Tr. 553-71.)

On March 13, 2009, Mark Altomari, Ph.D., submitted a Psychiatric Review Technique regarding plaintiff. He found that she suffered the medically determinable impairments of bipolar disorder and panic disorder with agoraphobia. However, he noted that plaintiff failed to submit

her daily living activity information and concluded that he had insufficient evidence to establish the severity of her condition. (Tr. 241-51.)

On March 25, 2009, plaintiff complained of headaches. She reported that she stopped smoking due to pregnancy but continued to consume caffeine. Dr. Tucker assessed somatic dysfunction of the spine, seizure disorder, panic disorder, depression, bipolar disorder, and anxiety neurosis. He applied osteopathic manipulation to her spine and administered injections Demerol and Vistaril.[11] He further recommended a referral for her headaches. (Tr. 257-58.)

On March 27, 2009, plaintiff complained of headaches and reported that the injections did not provide relief. Dr. Tucker considered meningitis and opined that Citalopram could have caused the headaches. He admitted her to the progressive care unit, prescribed Rocephin and replaced Citalopram with Risperdal.[12] (Tr. 255.)

Also on March 27, 2009, plaintiff reported that the headaches caused extreme dizziness and that she had not previously experienced such severe headaches. She reported that they occurred daily and typically during the evening and that they interfered with sleep. Light and noise exacerbated her headaches. She further reported that ibuprofen, Excedrin, and acetaminophen did not alleviate the pain. The impression of George Kerkemeyer, M.D., was headaches, dizziness, and poor dentition. He opined that she did not have the typical signs of migraine headaches and viewed meningitis and encephalitis as unlikely. He also noted that her medical records from 2005 contradicted her allegation that she had not previously experienced dizziness. Lyle Clark, M.D., observed mildly depressed mood, appropriate affect, and adequate insight and judgment. He assessed chronic, depressed, severe bipolar I disorder without psychotic features, panic disorder without agoraphobia, and conversion disorder with pseudo-seizures. He assessed a GAF of 55. Dr. Clark expressed concern regarding the interplay between the pregnancy and her psychiatric medication and recommended a consult. He discontinued Risperdal and decreased her dosage of Lexapro. (Tr. 572-604.)

Plaintiff received physical therapy, which she reported resolved the headache. However, she later complained of a headache that originated from a different part of the head. On March

---

[11] Demerol is used to treat moderate to severe pain. WebMD, http://www.webmd.com/drugs. Vistaril is used to treat anxiety and allergies. Id.

[12] Rocephin is an antibiotic. WebMD, http://www.webmd.com/drugs.

28, 2009, the impression of Brett Hosley, D.O., was headache, and he listed pregnancy, sinus infection, dental problems, and caffeine as possible causes. He also considered a questionable Chiari I malformation revealed in a brain MRI scan as the cause but regarded it as unlikely.[13] He recommended a neurosurgeon consultation following the delivery of her child and an MRI scan. He advised her to use only Tylenol for pain relief in the absence of further medical instruction. He also noted that orthostatic hypotension caused the dizziness, which had significantly improved following treatment. He recommended focusing on relaxation techniques and continued physical therapy. (Id.)

On March 29, 2009, plaintiff described her headache as less severe. Her mother reported that plaintiff did not function during the day and slept often. Dr. Tucker recommended continued physical therapy and heat application and lowered the Trileptal dosage. On March 20, 2009, plaintiff was discharged. (Id.)

On April 13, 2009, Dr. Hosley reaffirmed that plaintiff did not require anticonvulsant medications because her seizures were not epileptic. He also noted that he found no evidence of neurologic problems. (Tr. 282.)

On April 14, 2009, plaintiff complained of a headache and stiffness in the upper back and neck. She reported that she stopped taking Lexapro, decreased her dosage of Trileptal, but had not tapered Seroquel. Dr. Tucker encouraged her to continue tapering her use of Trileptal and to taper her use of Seroquel due to her pregnancy. He assessed first trimester pregnancy, acute muscle contraction cephalgia, and somatic dysfunction of the spine. He applied osteopathic manipulation to the spine and administered a Demerol injection. He also prescribed Vistaril. (Tr. 253.)

On April 24, 2009, plaintiff complained of constant abdominal cramps during the past three days. An ultrasound revealed normal gestation and fetal cardiac activity. Urinalysis revealed no urinary tract infection. Joaquin Guzon, M.D., diagnosed anemia and hypokalemia. (Tr. 269, 817-27.)

---

[13] Chiari I malformation is a condition in which brain tissue extends into the spinal canal and may cause severe headaches. Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/chiari-malformation/basics/definition/con-20031115.

On April 27, 2009, plaintiff complained of continued cramps and requested pain medication. Laura D. Maple, M.D., directed plaintiff to return to the emergency room in the event that the pain worsened. (Tr. 270.)

On June 10, 2009, plaintiff complained of muscle contraction headaches and severe pseudo-seizures. Dr. Tucker observed high anxiety and depressed mood. He administered an injection of Demerol and prescribed Ativan.[14] He cautioned her to avoid taking Ativan if she drove or needed to tend to her children. He also recommended that she stop smoking, and she reported that she had limited herself to one half pack per day. (Tr. 271-72.)

Also on June 10, 2009, Dr. Tucker submitted a Medical Source Statement regarding plaintiff. He found that, due to poor memory, plaintiff suffered moderate restrictions with the ability to understand and remember simple instructions and extreme limitations with the ability to understand, remember, and perform complex instructions and the ability to make complex work-related decisions. He further found that, due to her avoidance of the public and poor interactions with others, she suffered moderate limitations with the ability to interact appropriately with supervisors, marked limitations with the ability to interact appropriately with coworkers, and extreme limitations with the ability to appropriate interactions with the public and the ability to respond appropriately to usual work situations and changes in routine. He also noted that she suffered stress-induced seizures. He indicated that she became disabled on February 1, 2004 and that she could manage her own benefits. (Tr. 284-86.)

On July 10, 2009, plaintiff complained of a severe headache that began four days earlier. Dr. Tucker observed a restricted range of motion in the right spine. He assessed pregnancy, somatic dysfunction of the spine, and migraine cephalgia. He applied osteopathic manipulation to her spine, administered an injection of ketorolac, and recommended that she stop smoking.[15] (Tr. 273.)

On July 14, 2009, plaintiff reported that osteopathic manipulation partially alleviated her headache and that the injection provided short-term relief. Dr. Tucker applied osteopathic

---

[14] Ativan is used to treat anxiety. WebMD, http://www.webmd.com/drugs.

[15] Ketorolac is used to treat moderate to severe pain. WebMD, http://www.webmd.com/drugs.

manipulation to her spine and administered an injection of ketorolac. He also prescribed prednisone and recommended that she avoid caffeine.[16] (Tr. 274.)

On October 13, 2009, plaintiff complained of pelvic pain, which she rated as ten of ten, and the onset of labor. However, she was discharged from obstetrics later that day with a diagnosis of false labor. (Tr. 613-15.)

On October 19, 2009, plaintiff returned to obstetrics to induce labor. On October 21, 2009, she was discharged after delivering a baby. (Tr. 607-09.)

On October 30, 2009, a leg ultrasound revealed no evidence of deep venous thrombosis in the left leg. (Tr. 663.)

On December 1, 2009, plaintiff complained of seizures that occurred five or six times per day and soreness in the ribs, shoulder, and hip. She also complained of lack of focus and racing thoughts. Dr. Tucker observed a restricted range of motion for the right spine. He further observed an unstable mood, sadness, tearfulness, and anxiety. He assessed uncontrolled seizure disorder, depression, anxiety, bipolar disorder, trochanteric bursitis, and somatic dysfunction of the spine. He prescribed clonazepam and increased her dosage of Seroquel and Lexapro.[17] He also administered an injection to her femur and applied osteopathic manipulation to the spine. (Tr. 659.)

On December 3, 2009, plaintiff complained of increased pain in the rib cage, pelvis, and left hip. Moving her left hip and deep breaths exacerbated her pain. She further complained of seizures. X-rays of the ribs, chest, pelvis, and hips revealed no abnormalities. Dr. Tucker assessed recurrent seizure activity with epilepsy and contusions to the left hip, pelvis, and left ribs. He administrated an injection, prescribed hydrocodone, and replaced lorazepam with alprazolam.[18] (Tr. 657-58, 664-65.)

On December 11, 2009, plaintiff complained of multiple seizures and requested an opinion from another neurologist. Dr. Tucker observed extreme discomfort and a restricted range

---

[16] Prednisone is a corticosteroid that reduces the immune system response to reduce allergy symptoms. WebMD, http://www.webmd.com/drugs.

[17] Clonazepam is used to prevent and control seizures. WebMD, http://www.webmd.com/drugs.

[18] Hydrocodone is used to treat severe pain. WebMD, http://www.webmd.com/drugs. Alprazolam is used to treat anxiety and panic disorders. Id.

of motion of the spine. He further observed pain caused by standing and moving from a chair to an examination table. He assessed somatic dysfunction of the spine, contusion to the ribs, left pelvis, and hip, gastroenteritis, recurrent epileptic seizures, and panic disorder. He increased her dosage of clonazepam, administered an injection, and referred her to a neurologist. (Tr. 654-55.)

On January 11, 2010, plaintiff complained of low back pain that radiated to her legs. She also reported numbness and tingling from her knees to her feet and numerous seizures. Dr. Tucker observed seizure-like activity at his office. He called for an ambulance to take her to the emergency room. Her lab reports and head CT scan revealed no abnormalities. He assessed pseudo-seizures and low back pain. (Tr. 651-53, 800-16.)

On March 19, 2010, plaintiff complained of a headache that began several days earlier and stiffness in the neck and back. She also complained of nasal drainage. Dr. Tucker assessed sinusitis, somatic dysfunction of the spine, intractable migraine headaches, and lumbago. He administered a Demerol injection and applied osteopathic manipulation to the spine. (Tr. 648.)

On May 4, 2010, plaintiff complained of stiffness in the shoulders, neck, and upper back. She reported that she slipped on a wet surface one week earlier, which caused tailbone soreness and difficulty walking. She also complained of depression and reported that she did not take the prescribed dosage of Seroquel so she could care for her child. Dr. Tucker instructed her to take Seroquel daily. X-rays of the coccyx and sacrum revealed no abnormalities. He assessed somatic dysfunction of the spine, lumbago, coccyodynia, epilepsy, and bipolar disorder with predominant depression. He prescribed Naprosyn and increased her Seroquel dosage.[19] (Tr. 643-44, 662.)

On June 26, 2010, plaintiff arrived at the emergency room, complaining of a migraine that began three days earlier. Aziz Doumit, M.D., diagnosed a migraine headache. (Tr. 787-99.)

On June 30, 2010, plaintiff complained of an intractable headache that began one week earlier and caused light and sound sensitivity. Dr. Tucker assessed intractable migraine headache cluster and administered injections of Demerol and Phenergan.[20] (Tr. 641.)

On July 7, 2010, plaintiff reported that Lexapro no longer alleviated her depression. She also complained of migraine cluster headaches and low back pain. She satisfaction with her back

---

[19] Naprosyn is used to relieve pain and swelling. WebMD, http://www.webmd.com/drugs.

[20] Phenergan is used to prevent and treat nausea and vomiting. WebMD, http://www.webmd.com/drugs.

pain medication. Dr. Tucker assessed bipolar disorder with predominant depression, intractable migraine headache cluster, and lumbago. He observed a depressed mood. He replaced Lexapro with fluoxetine, prescribed Imitrex, and administered an injection of Demerol.[21] (Tr. 238.)

On August 3, 2010, plaintiff complained of seizures and reported that she injured her tailbone and back during her last seizure, causing stiffness and a limited range of motion. She further complained of a headache that began three days earlier and reported that Imitrex did not relieve the pain. He assessed somatic dysfunction of the spine, intractable migraine headache cluster, and a sacrum contusion. He applied osteopathic manipulation to the spine, administered an injection of Demerol, and recommended a firmly fitted girdle. (Tr. 635.)

On September 9, 2010, plaintiff complained of tooth pain and facial swelling. C. Leann Boxerman, D.O., assessed dental caries with infection and prescribed Keflex and Darvocet.[22] (Tr. 830.)

On September 16, 2010, plaintiff complained of a fever, sore throat, cough, runny nose, and a severe headache. Mary Chapel, NP-C assessed acute sinusitis and migraine headache and prescribed Augmentin and Toradol.[23] (Tr. 832.)

On October 6, 2010, plaintiff complained of severe seizures during the past two weeks and difficulty sleeping. Dr. Tucker assessed epilepsy, influenza, somatic dysfunction of the spine, intractable migraine headache cluster, and lumbago. He administered injection of Demerol and Phenergan and applied osteopathic manipulation to her spine. He also increased her dosage of Seroquel. (Tr. 631-32.)

On October 20, 2010, plaintiff complained of four epileptic seizures during the past week and that they caused her to injure her coccyx. Dr. Tucker assessed epilepsy with frequent seizures, somatic dysfunction of the spine, and coccyx and sacrum contusion. He instructed her to avoid driving, referred her to neurology, applied osteopathic treatment to the spine, and administered an injection of ketorolac. (Tr. 705.)

---

[21] Fluoxetine is used to treat depression, panic attacks, and obsessive compulsive disorder. WebMD, http://www.webmd.com/drugs. Imitrex is used to treat migraines. Id.

[22] Keflex is an antibiotic. WebMD, http://www.webmd.com/drugs. Darvon is used to treat pain. WebMD, http://www.webmd.com/painman agement/news/20101119/darvon-darvocet-banned.

[23] Toradol is also known as ketorolac which is used to treat pain. WebMD, http://www.webmd.com/drugs.

On December 15, 2010, plaintiff complained of panic disorder and that clonazepam did not control the disorder. She further complained of stiffness in the neck and back, migraine headaches, and epilepsy. She reported that Imitrex did not relieve the headache but that hydrocodone alleviated back pain. Dr. Tucker observed a high anxiety level and depressed mood. She assessed panic disorder, somatic dysfunction of the spine, intractable migraine headache cluster, epilepsy, and lumbago. He prescribed alprazolam and applied osteopathic manipulation to the spine. (Tr. 701-02.)

On December 27, 2010, plaintiff reported fever, chills, lethargy, slurred speech, headache, and a sore throat. Dr. Tucker assessed cystitis with bilateral pyelonephritis, sinusitis, and bronchitis. Dr. Tucker administered a Rocephin injection and prescribed Cipro.[24] (Tr. 699.)

On January 19, 2011, plaintiff arrived at the emergency room, complaining of migraines. Timothy B. Raleigh, D.O., diagnosed a headache. (Tr. 775-86.)

On February 18, 2011, plaintiff complained of frequent seizures and reported that her pain medication worked effectively. Dr. Tucker described her as very anxious and jittery and observed a restricted range of motion of the spine. He assessed anxiety neurosis with pseudo-seizures, somatic dysfunction of the spine, and lumbago. He increased her dosage of clonazepam and applied osteopathic manipulation to the spine. (Tr. 696.)

On April 25, 2011, plaintiff fell during a seizure, which caused soreness to the tailbone area. She also complained of persistent dermatitis and that her family recently received treatment for scabies. Coccyx X-rays revealed no abnormalities. Dr. Tucker assessed coccyx and sacrum contusion, lumbago, and urticarial dermatitis. He recommended a tightly fitting girdle, administered an injection of ketorolac, and prescribed Atarax.[25] (Tr. 666, 693.)

On July 25, 2011, plaintiff arrived at the emergency room, complaining of dental pain. She reported that she had her wisdom teeth removed recently and had a dry socket, rating the pain as ten of ten. David S. Glasgow, M.D., diagnosed dental pain and prescribed Vicodin. (Tr. 766-74.)

---

[24] Cipro is an antibiotic. WebMD, http://www.webmd.com/drugs.

[25] Atarax is used to treat itching caused by allergies. WebMD, http://www.webmd.com/drugs.

On August 10, 2011, plaintiff reported that she received psychiatric care, which resulted in changes to her medication, but she had not followed up on it. Dr. Tucker remarked that he had not seen plaintiff since May and that she had not complied with her prescriptions. She complained of racing thoughts, periods of depression, suicidal thoughts, and anger issues. She further complained of seizures and pain. Dr. Tucker recommended psychiatric care and suspected poor nutrition. He also recommended that she stop smoking cigarettes. Additionally, she complained of a headache that began three days earlier. Dr. Tucker observed that plaintiff weighed only 129 pounds and had lost twelve pounds since April. He assessed acute intractable migraine headache cluster, somatic dysfunction of the spine, ulcer, nutritional deficiency, nicotine dependence, and bipolar disorder with mania, depression, intermittent suicidal thoughts, anger issues, and lack of medication compliance. He also applied osteopathic manipulation to the spine and administered an injection of Demerol. (Tr. 689-90.)

On September 29, 2011, plaintiff arrived at the emergency room, reporting that she had seven seizures that day. She also complained of tailbone and back pain. A lumbar CT scan revealed no abnormalities. Donald Miller, D.O., diagnosed seizure and back contusion and prescribed Lortab and Valium.[26] (Tr. 745-65.)

On November 14, 2011, plaintiff complained of migraines, vomiting, and sensitivity to light and sound. She reported that she had seventeen seizures during the past month and complained of neck and shoulder tightness. Dr. Tucker assessed nausea, migraine headache, and somatic dysfunction of the spine. He administered injections of Toradol and Phenergan and prescribed hydrocodone and Imitrex. (Tr. 685-88.)

On November 23, 2011, plaintiff complained of a migraine that began three days earlier and back stiffness. She reported that she stopped taking medication due to lack of insurance coverage but that she had regained coverage. Dr. Tucker observed a limited range of motion in the spine. He assessed lumbago, somatic dysfunction of the spine, and acute intractable migraine headache cluster. He administered an injection of Demerol and applied osteopathic manipulation to the spine. He also recommended that she avoid caffeine and skipping meals. (Tr. 682.)

On January 1, 2012, plaintiff arrived at the emergency room, complaining of a migraine. She further reported nausea and fever and rated the pain as ten of ten. A head CT scan revealed

---

[26] Lortab is used to treat pain. WebMD, http://www.webmd.com/drugs. Valium is used to treat anxiety. Id.

no acute findings. Dr. Glasgow diagnosed acute sinusitis and headache and prescribed amoxicillin and prednisone.[27] (Tr. 737-44.)

On February 2, 2012, plaintiff complained of shoulder pain and neck and low back stiffness. She reported that she injured herself during the seizure episodes. She further complained of migraine headaches. Dr. Tucker assessed somatic dysfunction of the spine, intractable migraine headache cluster, pseudo-seizures, and fibromyalgia. He applied osteopathic manipulation to the spine and right shoulder and administered an injection of Demerol. (Tr. 678.)

On February 16, 2012, plaintiff arrived at the emergency room, complaining of back pain. She reported that she experienced a seizure that caused her to fall backwards. X-rays of the spine revealed no abnormalities, and CT scans of the head revealed maxillary sinus disease. Lee Dudley, D.O., diagnosed head contusion, acute sinusitis, and back strain and prescribed doxycycline, Claritin-D, and Flexeril.[28] (Tr. 709-26.)

On February 29, 2012, plaintiff complained of difficulty sleeping, seizures, and memory loss. She reported that alprazolam and clonazepam caused the inability to function and that her teenage children caused her stress. She also reported lack of appetite and that her memory does not allow her to manage her medication. Dr. Tucker assessed bipolar disorder with predominant mania and frequent pseudo-seizures, amnesia caused by alprazolam and clonazepam, chronic low back pain, and hypoglycemia. He replaced Seroquel with Abilify, discontinued alprazolam and clonazepam, and instructed her to eat three meals per day. (Tr. 839-40.)

On June 27, 2012, plaintiff complained of a migraine headache that began three days earlier. She also reported a seizure that caused her to injure her jaw. Nurse Chapel assessed migraine headache and administered an injection of Demerol. (Tr. 834-35.)

On November 27, 2012, plaintiff sought services for anxiety at Transitions of Western Illinois. She reported that she experienced anxiety attacks daily and had bipolar disorder. She reported that she had three children, had received child support, but recently lost it. She further reported she received treatment for pseudo-seizures and that they had subsided. Additionally, she

---

[27] Amoxicillin is an antibiotic. WebMD, http://www.webmd.com/drugs.

[28] Doxycycline is an antibiotic. WebMD, http://www.webmd.com/drugs. Claritin is used to treat allergy symptoms. Id. Flexeril is used to treat muscle spasms. Id.

reported difficulty concentrating, irritability, and loss of interest. Greg Lowers, QMHP, diagnosed mild bipolar I disorder and assessed a GAF score of 55. (Tr. 863-72.)

On February 5, 2013, Valentina Vrtikapa, M.D., performed a psychiatric evaluation on plaintiff. Plaintiff reported that she lived with her boyfriend and her three sons. She had not taken medication recently. Dr. Vrtikapa observed anxious mood but appropriate affect. Her impression was anxiety disorder, and she assessed a GAF of 55. She prescribed Trileptal and Viibryd.[29] (Tr. 858-59.)

On February 19, 2013, plaintiff reported increased anxiety but that her medication alleviated her depression. She received a prescription for Vistaril. (Tr. 893-95.)

On May 20, 2013, plaintiff arrived at the emergency room, complaining of dental pain and reported that she broke a tooth. However, plaintiff left without waiting to receive medical attention. (Tr. 843-51.)

On June 17, 2013, Transitions of Western Illinois discharged plaintiff due to lack of participation. (Tr. 853.)

On July 31, 2013, plaintiff complained of depression and bipolar disorder. She reported that she had not taken medication for one year. Casey Jennings, D.O., assessed bipolar I disorder and anxiety disorder and prescribed Trileptal and Xanax.[30] (Tr. 906.)

On August 29, 2013, Dr. Jennings submitted a Medical Source Statement regarding plaintiff. Dr. Jennings found that, due to severe anxiety and racing thoughts, plaintiff suffered moderate limitations with the ability to understand and remember complex instructions and marked limitations with the ability to perform complex instructions and the ability to make judgments on complex work decisions. He also found mild limitations with the ability to respond appropriately to usual work situations and routine changes, moderate limitations with the ability to interact appropriately with the public, and marked limitations with the ability to interact appropriately with coworkers and supervisors. Dr. Jennings cited plaintiff's symptoms of racing thoughts, manic behavior, irritability, severe anxiety, and avoidance of the public. Dr. Jennings also found that plaintiff's impairments caused good and bad days and would cause her to miss

---

[29] Viibryd is used to treat depression and other mental/mood disorders. WebMD, http://www.webmd.com/drugs.

[30] Xanax is used to treat depression. WebMD, http://www.webmd.com/drugs.

more than four days per month of work.  Dr. Jennings further found that plaintiff's impairments would interfere with attention and concentration about twenty percent of the time.  (Tr. 912-14.)

**First ALJ Hearing**

The ALJ conducted a hearing on October 16, 2009.  (Tr. 21-48.)  Plaintiff testified to the following.  She is twenty-three years old, single, and lives with her mother and two children, ages six and four.  She measures five feet, six inches, and weighs 190 pounds.  She has a driver's license and graduated from high school.  She last worked in August 2008 for about four months in a mental health home as an aide, where she cleaned and prepared meals.  Her employer terminated her after she missed several days of work due her medical condition.  (Tr. 26-28.)

Her doctor-patient relationship with Dr. Tucker began at age nine, and she visits him monthly for depression, bipolar disorder, and anxiety.  Her medication helps her but causes drowsiness for half the day.  On a typical day, she awakens at 7:00 a.m. to dress her children for school.  She drives them to school, then cleans and prepares lunch.  At 11:45 a.m., she drives her youngest son home, feeds him lunch, then performs more cleaning.  At 3:15 p.m., her oldest son comes home.  She checks her sons' homework assignments until she prepares dinner at 5:30 p.m.  She then assists her children with bathing, and they go to bed at 8:30 p.m.  Afterwards, she sits, takes medication, and goes to bed at 11:00 p.m.  She can dress herself and perform personal hygiene tasks.  She can grocery shop but only in the company of her mother or friend.  She can launder, wash dishes, and sweep.  (Tr. 29-33.)

She experiences four twenty-minute panic attacks per day.  Panic attacks cause the inability to breath and calm herself.  She also experiences three pseudo-seizures per week, which cause loss of consciousness and memory.  Dr. Tucker often advises her to leave jobs.  Her mood swings affect her ability to work, particularly regarding interactions with the public.  She has taken medication since age sixteen.  She received biweekly mental health treatment from a psychiatrist at Comprehensive Health for two years in ten-minute sessions.  She does not see any family or friends except for her children and mother.  She avoids people because she angers very easily.  She struggles with paperwork, watching movies, and reading books, due to lack of concentration.  She has pain after pseudo-seizures that lasts for one or two days.  She can lift about thirty pounds.  Panic attacks cause dizziness, which interferes with walking.  She could walk or stand for six or seven hours in an eight-hour workday.  She can sit and drive.  (Tr. 33-37.)

- 17 -

She hears voices that criticize others, which causes paranoia and anxiety. Dizziness can last for hours. She cycles from depression to mania daily, and the transformation can occur within an hour. During mania, she moves constantly and often cleans to perfection and cooks more than necessary. She has also spent more money than she had during a manic episode. During depression, she feels angry, paranoid, and afraid, and she lies for most of the day. She awakens three or four times per night for about forty-five minutes each time. Depression renders her unable to transport her children about two days per week. On those days, her mother transports her children. Her mother drove her to the hearing. The distance from her home to her children's school is six blocks. She often transports her children to school in nightclothes. (Tr. 38-41.)

Vocational Expert (VE) Frank Mendrick also testified at the hearing. Plaintiff's past relevant work included nursing home aide, which is light, semi-skilled work but heavy work as she performed it. The ALJ presented a hypothetical individual with plaintiff's age, education, and work experience, who could perform only unskilled work with no contact with the general public and only occasional contact with supervisors and coworkers. The VE replied that such individual could perform light work as a small products assembler, which has two to four thousand positions in Missouri, electrical products inspector, which has 1,500 positions in Missouri, and hang bagger, which has 1,500 positions in Missouri. The VE also replied that Missouri had 5,000 jobs requiring light work and seven to eight thousand jobs requiring sedentary work that accommodated the hypothetical individual. The VE further testified that limiting the individual to no contact with coworkers would not change the number of accommodating jobs. Additionally, the VE testified that more than three absences per week would preclude employment. (Tr. 42-46.)

Plaintiff's counsel presented a hypothetical individual with extreme limitations in her ability to interact appropriately with the public and the ability to respond appropriately to usual work situations and to changes in a routine work setting, and marked limitation with the ability to interact appropriately with coworkers. The VE responded that such individual could perform no work. (Tr. 46-47.)

**First Decision of the ALJ**

On November 4, 2009, the ALJ issued a decision that plaintiff was not disabled. (Tr. 10-20.) However, after plaintiff's request for judicial review, the Commissioner moved to remand

the case to the ALJ.  On April 12, 2011, the court granted the motion, ordering the ALJ to consider the opinion of Dr. Tucker, evaluate plaintiff's RFC, and consider the effects of plaintiff's mental limitations.  (Tr. 351.)

**Second ALJ Hearing**

Following the remand, a different ALJ conducted a hearing on September 9, 2013.  (Tr. 310-331.)  Plaintiff testified to the following.  She has not worked since the earlier hearing.  She replaced Dr. Tucker, her former physician, with Dr. Jennings.  She moved to Quincy to change the environment for her children.  At Transitions, she received a psychiatric evaluation and medication management.  Her attendance to the Transitions program suffered due to lack of transportation and her move back to Center.  She left Quincy due to the large schools and the size of the town.  Dr. Jennings manages her medication.  (Tr. 314-16.)

She experiences good and bad days due to bipolar disorder.  On a bad day, she does not want to leave her bed and wears her pajamas all day.  She awakens her children, who then prepare their own breakfast and leave for school.  When they return, they eat TV dinners.  She sleeps most of the day.  Five days per week are bad days.  On good days, she works quickly, and her thoughts race.  She performs housework and moves constantly, but she does not converse or leave the home.  (Tr. 316-17.)

She experiences panic attacks three times per day that last for five to ten minutes.  During panic attacks, she swells, and her heart pounds.  She fully recovers after about an hour of rest.  To recover, she breathes, counts to ten, focuses her vision on a point, takes Xanax, and distracts herself from the panic attack trigger.  She also experiences pseudo-seizures during the panic attacks at least once per day.  Trileptal lessens the severity of pseudo-seizures, decreasing the frequency of resulting injuries, but does not prevent them.  Anxiety and stress cause the pseudo-seizures.  She also experiences depression, which causes her to feel worthless and subpar and to seek isolation.  She cries at least once per day.  Additionally, she experiences paranoia, causing her to feel as though others are staring at her or talking about her.  (Tr. 318-20.)

She experiences excruciating migraine headaches at least once per day.  She has not found medication to prevent the pain.  The headaches last two to three hours and cause light sensitivity, nausea, and vomiting.  She has not consumed drugs or alcohol since high school.  Her current medications include Trazodone, Trileptal, and alprazolam.  Trazodone improves the quality of her

sleep, and she experiences only one sleep interruption per night. Even on good days, she requires her mother or friend to accompany her to the grocery store. Anxiety and paranoia prevent her from shopping alone. She cannot shop on bad days. Driving in Quincy caused anxiety due to spacing and the number of lanes. (Tr. 320-23.)

She has three children, ages three, seven, and nine. Her mother assists her with laundry and preparing them for school. On her bad days, her grandmother cares for the three-year old. She saw Dr. Tucker from age twelve until about six months ago. She now sees Dr. Jennings, a psychiatrist, through Eastern Missouri Mental Health. (Tr. 323-24.)

VE Dan Zumalt also testified at the hearing. In response to the VE's request for clarification, plaintiff testified that she worked at Subway by preparing sandwiches. The VE testified that plaintiff performed work as a companion, which is light, semi-skilled work but had been performed by plaintiff as heavy work; hand cutter, which is light, unskilled work but had been performed by plaintiff as medium work; sales attendant, which is light, unskilled work but had been performed by plaintiff as heavy work; fast food worker, which is light, unskilled work; and cashier checker, which is light, semiskilled work but had been performed by plaintiff as medium work. (Tr. 324-27.)

The ALJ presented a hypothetical individual with plaintiff's age, education, and work experience, who could perform light work, but could only occasionally climb ladders, ropes, scaffolds, ramps, and stairs, stoop, crouch, kneel, and crawl, and must avoid all use of hazardous machinery and exposure to unprotected heights. The ALJ further limited the hypothetical individual to simple work, which he defined as work consisting of routine, repetitive tasks, occasional decision-making, occasional changes in the work setting, no strict production requirements, no interaction with the general public, and occasional interaction with coworkers and supervisors. The VE responded that such individual would be excluded from plaintiff's past relevant work. However, such individual could perform work as a collator operator, which is light, unskilled work with 36,310 positions nationally and 1,160 positions in Missouri; inserting machine operator, which is light, unskilled work with 43,215 positions nationally and 1,300 in Missouri; and folding machine operator, which is light, unskilled work with 46,310 positions nationally and 1,740 positions in Missouri. (Tr. 327-28.)

The ALJ then altered the hypothetical individual, noting that such individual would be off task for twenty percent of the day in addition to regularly scheduled breaks.  The VE responded that such individual could perform no work.  The VE further stated that two or more unscheduled, unexcused absences per month or breaks during the day would also preclude work.  (Tr. 328-29.)

Plaintiff's counsel presented a hypothetical individual who acted inappropriately with supervisors and coworkers thirty to fifty percent of the time.  The VE responded that such individual could perform no work.  (Tr. 330.)

## III. DECISION OF THE ALJ

On September 25, 2013, the ALJ issued a decision that plaintiff was not disabled.  (Tr. 290-303.)  At Step One of the prescribed regulatory decision-making scheme,[31] the ALJ found that plaintiff had not engaged in substantial gainful activity since September 30, 2009.  At Step Two, the ALJ found that plaintiff's severe impairments included somatic dysfunction, pseudo-seizures, depression, anxiety, and bipolar disorder.  (Tr. 293.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments.  (Id.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform light work and could only occasionally climb ladders, ropes, scaffolds, ramps, and stairs, stoop, crouch, kneel, and crawl, and should avoid all use of hazardous machinery and exposure to unprotected heights.  The ALJ further limited plaintiff to simple work consisting of routine, repetitive tasks, occasional decision-making, occasional changes in the work setting, no strict production requirements, no interaction with the general public, and occasional interaction with coworkers and supervisors.  At Step Four, the ALJ found that plaintiff could perform no past relevant work.  (Tr. 296-301.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy.  (Tr. 301.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are

---

[31] See below for explanation.

supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 416.920(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW). Id. § 416.920(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 416.920(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred by: (1) finding plaintiff not credible; (2) affording little weight to the opinion of Dr. Tucker; (3) improperly evaluating the severity of plaintiff's mental impairments; and (4) improperly determining plaintiff's RFC.

## A. Credibility

Plaintiff argues that the ALJ erroneously discounted plaintiff's allegations. To evaluate a claimant's subjective complaints, the ALJ must consider the Polaski factors: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010). The ALJ may also consider inconsistencies in the record as a whole. Id. "[Courts] defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." Id.

The ALJ found plaintiff's allegations as not fully credible. The ALJ noted inconsistencies regarding the frequency of the pseudo-seizures. For instance, at the October 2009 hearing, plaintiff testified that she experienced three pseudo-seizures per day. (Tr. 34, 36.) However, at the September 2013 hearing, plaintiff testified that she experienced at least one pseudo-seizure per day. (Tr. 318-19.) The ALJ further noted the inconsistency of plaintiff's March 2009 report that she suffered only two pseudo-seizures total after a January 2009 report that she suffered up to three seizures per day. (Tr. 236, 259-61.) She later reported that the seizures had subsided. (Tr. 863-72.)

Additionally, the ALJ recognized further inconsistencies in plaintiff's testimony at the two hearings. At the October 2009 hearing, plaintiff testified that the panic attacks lasted for twenty minutes and that she had four or five good days and two or three bad days per week. (Tr. 33-34, 40-41.) However, at the September 2013 hearing, she testified that the panic attacks lasted five to ten minutes and that she had two good days and five bad days per week. (Tr. 316-17.)

The ALJ also found plaintiff's failure to seek or comply with medical treatment to be inconsistent with her allegations. "[F]ailure to follow a prescribed course of treatment without good reason can be a ground for denying an application for benefits." Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). In May 2008, Sean Meyer noted missed psychiatric appointments and limited medication compliance. (Tr. 207.) In August 2011, Dr. Tucker, her primary care physician, noted that he had not seen her since the previous May and that she had stopped seeking psychiatric care and complying with her medication prescriptions. (Tr. 689-90.) Moreover,

plaintiff failed to follow medical instructions to discontinue smoking. (Tr. 261, 271-73, 689, 728.)

Further,"[w]hile the ALJ's observations cannot be the sole basis of his decision, it is not an error to include his observations as one of several factors." Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008). Thus, the ALJ lawfully considered her demeanor at the hearing, and specifically characterized his observations as merely one factor of the credibility determination. (Tr. 299.) The ALJ further considered plaintiff's daily activities. At the hearings, plaintiff testified that she cared for three children, helped them with homework, drove, prepared meals, laundered, washed dishes, swept, and performed personal hygiene tasks. (Tr. 29-33, 316-17.)

Plaintiff argues that the volatile, unpredictable nature of her mental condition explains the discrepancies on which the ALJ relies to discredit plaintiff's allegations. Although plaintiff's explanation finds some support in the record, the court "may not reverse the Secretary's decision when there is enough evidence in the record to support either outcome." Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). In sum, the court concludes that substantial evidence supports the ALJ's decision to discount plaintiff's allegations.

**B. Opinion of Dr. Tucker**

Plaintiff argues that the ALJ improperly considered the opinion of Dr. Tucker. The ALJ should consider each of the following factors in evaluating medical opinions: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is also a specialist; and (6) any other factors brought to the ALJ's attention. 20 C.F.R. § 416.927(c). Further, an ALJ is not obligated to defer to a treating physician's medical opinion unless it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [is] not inconsistent with the other substantial evidence in the record." Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008) (quoting Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir. 2005)). An ALJ may discount a physician's opinion that is based on discredited subjective complaints. Craig v. Apfel, 212 F.3d 433, 436 (8th Cir.2000). "[A] conclusory checkbox form has little evidentiary value when it "cites no medical evidence, and provides little to no elaboration." Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012).

The ALJ gave little weight to the June 2009 opinion of Dr. Tucker. (Tr. 300.) The ALJ noted that the mental health symptoms reported in the treatment notes at that time had been resolved with Klonopin and that plaintiff had not complied with that prescription. (Id.) The ALJ further found that Dr. Tucker relied on the complaints of plaintiff, who the ALJ found not credible as set forth above, rather than objective medical findings. (Id.) He also noted the conclusory nature of the opinion with little explanation or reference to treatment notes. (Id.)

Dr. Tucker's treatment notes prior to the June 2009 report contain very few complaints regarding plaintiff's mental condition. (Tr. 231, 253, 255, 257-61, 263 271-72, 572-604.) Plaintiff argues that few objective tests apply to her mental condition; however, Dr. Tucker's notes also include few objective observations regarding her demeanor and interactions with him indicating mental impairment. (Id.) Finally, Dr. Tucker submitted his opinion in checkbox form citing to symptoms not included in the relevant treatment notes. (Tr. 284-86.)

The ALJ afforded the opinion of Dr. Tucker little weight for lawful reasons that find support in the record. Accordingly, plaintiff's argument regarding the weight afforded by the ALJ to Dr. Tucker's opinion is without merit.

## C. Severity of mental limitations

Plaintiff argues that the ALJ failed to evaluate the severity of the functional limitations resulting from her mental impairments as required by 20 C.F.R. § 416.920a. The regulation details a prescribed technique in which the ALJ must consider the record and rate the effect of a claimant's mental impairments on the areas of daily living activities, social functioning, and concentration, persistence, and pace in addition to considering the number of episodes of decompensation. 20 C.F.R. § 416.920a.

The ALJ found that plaintiff experienced mild restriction with daily living activities. The ALJ noted that plaintiff described herself as a homemaker and reported that she, rather than her mother, performed housework due to her mother's health, fatigue, and stress. (Tr. 211, 609.) The ALJ also relied on plaintiff's ability to care for her children and her guardianship over her half-brother. (Tr. 207.)

Plaintiff argues that the ALJ noted plaintiff's ability to clean, shop, cook, take public transportation, pay bills, maintain a residence, maintain personal hygiene, use telephones, and use the post office without citing the record. However, plaintiff erroneously frames the ALJ's

statement; the ALJ merely stated that he found only mild restrictions with daily activities while providing an illustrative list of basic daily activities. (Tr. 294.) Moreover, the record supports plaintiff's ability to perform many of these activities. (Tr. 29-33.) Plaintiff also argues that the statement regarding housework cited by the ALJ predated the onset date. However, the statement predated the alleged onset date by only four months. (Tr. 211.) Additionally, plaintiff's statement that her mental impairments date back to childhood bolsters the relevance of the statement regarding housework. (Doc. 13 at 13.)

Plaintiff further argues that the ALJ referred without context to the description of herself as a homemaker and to her guardianship over her half-brother. Specifically, plaintiff explains that she only referred to herself as a homemaker to avoid embarrassment and downplays the significance of the guardianship. However, these explanations are not set forth in the record, and the ALJ did not unreasonably interpret these statements as support for his conclusion that plaintiff experienced only mild restrictions with daily living activities.

The ALJ found that plaintiff experienced moderate restriction with social functioning. The ALJ noted that plaintiff lived with others and maintained romantic relationships. (Tr. 24, 858-597.) He also noted that plaintiff attributed her lack of social life to childcare requirements rather than her mental condition. (Tr. 211.) He discussed that she could function in social settings to some extent, citing her capacity for grocery shopping and transporting her children to school. (Tr. 29-33.) He further noted that her treatment records documented no social impairment incidents such as issues in the waiting room or inappropriate behavior with staff or her physicians.

Plaintiff argues that she experiences social functioning impairments as a result of her avoidance of others. However, the ALJ credited this assertion by finding a moderate restriction and including RFC limitations regarding interactions with coworkers, supervisors, and the general public. (Tr. 294-96.)

The ALJ found that plaintiff experienced moderate restriction with concentration, persistence, and pace. The ALJ again cited plaintiff's daily living activities and that the medical records contained no evidence of chronic attention, concentration, or memory deficits. Plaintiff argues that the ALJ failed to identify the medical records upon which he relied for this

determination.  However, the ALJ expressly discussed plaintiff's mental treatment records in his decision.  (Tr. 298.)

Accordingly, plaintiff's arguments regarding the ALJ's determination of the severity of the functional limitations resulting from her mental impairments are without merit.

**D. RFC Determination**

Plaintiff argues that the ALJ erroneously determined her RFC, contending that the record indicates that plaintiff would miss more than two days of work per month and that she would interact inappropriately with coworkers for thirty to fifty percent of the time.  Plaintiff's testimony and Dr. Jennings' opinion indicate that she would miss more than two days of work per month.  (Tr. 38-41, 316-17.)  The opinions of Dr. Jennings and Dr. Tucker indicate that plaintiff would interact inappropriately with coworkers for thirty to fifty percent of the time.  (Tr. 284-86, 912-14.)  However, the ALJ lawfully found her testimony and Dr. Tucker's opinion not credible as set forth above.  Additionally, the ALJ discounted Dr. Jennings' opinion, noting the conclusory nature of the opinion and that Dr. Jennings' treatment history consisted of a single visit in which plaintiff reported that she had not taken medication for a year.  (Tr. 906, 912-14.)

Accordingly, plaintiff's argument regarding the ALJ's determination of her RFC is without merit.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.


   /S/  David D. Noce                  
**UNITED STATES MAGISTRATE JUDGE**

Signed on February 18, 2015.